**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DORSEY, | ) | CASE NO. 1:23-CV-00697-CEH |
| | ) | |
| Plaintiff, | ) | CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION & |
| COMMISSIONER OF SOCIAL SECURITY | ) | ORDER |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## I. Introduction

Plaintiff, John Dorsey ("Dorsey" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 5). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

## II. Procedural History

On October 27, 2011, Claimant filed an application for DIB, alleging disability onset the same day. (ECF No. 9, PageID #: 45). The application was denied initially, upon reconsideration, and in a written decision by an administrative law judge ("ALJ") following a hearing. (*Id.* at PageID #: 42-54). The Appeals Council declined further review and Claimant filed a complaint in this Court challenging the Commissioner's final decision. (*Id.* at PageID #: 33). On September 17, 2015, based on the parties' stipulation, the case was remanded for further proceedings. (*Id.* at PageID #: 1030-31).

1

After remand, a second ALJ conducted a hearing and, on July 30, 2019, issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 1059-75). Claimant filed written exceptions and the Appeals Council remanded the case back to the ALJ on July 8, 2020.[1] (*Id.* at PageID #: 1055-57).

On November 18, 2020, the second ALJ held another hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.* at PageID #: 890). On December 15, 2020, the second ALJ again issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 890-905). The ALJ's decision became final on February 13, 2023, when the Appeals Council declined further review. (*Id.* at PageID #: 880).

On April 4, 2023, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12-1, 13). Claimant asserts the following assignments of error:

> (1) WHETHER THE ADMINISTRATIVE LAW JUDGE ERRED IN WEIGHING AND EVALUATING OPINIONS FROM TREATING AND EXAMINING SOURCES
>
> (2) WHETHER THE ADMINISTRATIVE LAW JUDGE ERRED IN DETERMINING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY WITHOUT PROPER CONSIDERATION AND EXTENT OF HIS IMPAIRMENTS.

(ECF No. 12-1 at 1).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

The claimant testified he lives with his aunt. He is separated from his wife. Claimant alleges physical difficulty working. He testified he was shot in both legs

---

[1] Claimant had filed additional applications on January 29, 2015 and October 17, 2019, but the Appeals Council's remand rendered them duplicate applications which were consolidated into the initial application. (ECF No. 9, PageID #: 890; *see id.* at PageID #: 1428).

and his foot. He has difficulty standing and walking. He testified he has been shot twice in the stomach. He said he has difficulty lifting. His condition has not improved since the prior hearing in June 2019. Claimant said he was going to physical therapy, but had to stop due to Covid-19. Claimant had a right hand injury and said he cannot bend his last two fingers. He said he cannot bend the middle finger on his left hand.

When asked if he had been imprisoned since 2011, claimant said "no". The record shows the claimant has been in and out of the Cuyahoga County Jail since 2017. Claimant was booked into the Cuyahoga County Jail on August 24, 2017, for a probation violation for failure to report dirty urine (cocaine, THC) (Exhibit 38F/2). Claimant was again booked into the Cuyahoga County Jail on November 19, 2017, this time for domestic violence (Exhibit 44F/22). It was unclear how long claimant was in jail, but by March 2018 he was in a halfway house (Exhibit 45F/26). Since claimant was in the county jail and not a state prison, he may not have considered these to be incarcerations. When claimant presented for a psych evaluation on June 5, 2019, he said he was recently in prison for 6 months. He was released on March 25 (Exhibit 47F/4-5).

Claimant also testified he has mental limitations. He testified he was taking his medication. He still talks to his case worker. He does not trust people. He said he does not like being around people. Claimant testified he is currently not drinking alcohol or illicit drugs. He said he last used cocaine four years ago. He last used marijuana three years ago. He testified he cannot remember the last time he used alcohol, but said "it's been awhile". The record shows ongoing problems with substance use. In 2017, claimant he was using marijuana daily and drinking alcohol prior to probation (Exhibit 45F/5). In June 2019, claimant said he was drinking alcohol 2-4 times a month. He used marijuana every other day (Exhibit 47F/5). Claimant was also brought to the hospital after using PCP in December 2019 and August 2020 (Exhibit 49F/11-13; 51F/37).

As to activities of daily living, claimant said he is trying to live with the pain. Someone shops for the claimant. He does not do laundry. Sometimes he goes with his aunt to the laundromat, just to get out of the house. He does some sweeping around the house. He washes the dishes. Sometimes he takes out the trash. He no longer does yard work due to his hand problems. Claimant does not see his children much since his separation from this wife. He estimated it has been a year since he has seen his children. In a typical day, the claimant said he wakes up and watches TV. He said he does not do too much. He walks in the neighborhood once a week. Sometimes his cousin comes over and they talk. Two or three friends come over twice a week.

(ECF No. 9, PageID #: 895-96).

3

**B. Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

Laurence Bilfield, M.D., performed a total right knee replacement on December 27, 2011 (Exhibit 6F/8-9; duplicates at 8F/29-30 and 11F/18-19). An x-ray of the right knee on February 29, 2012, showed preserved joint spaces and no osteolytic process, but moderate continued joint effusion (Exhibit 11F/12).

Edward Butler, M.D., examined the claimant at the request of the State agency on March 9, 2012. On examination, the claimant had an antalgic gait to the right, which was improved with the use of a cane. Claimant's physical therapy had given him the cane the day prior to this examination. Aside from 4/5 strength in the right knee, he had full strength in all muscles. Aside from loss of range of motion in his knee, he had full range in all planes. Dr. Butler opined that the claimant would have moderate limitations to his exertion, and mild limitations to the use of his hands (Exhibit 10F). . . . At this time, claimant had not alleged any hand related impairments. Claimant's grasp, manipulation, pinch, and fine coordination were normal in both hands (Exhibit 10F/7).

Patch testing by an allergist confirmed a nickel allergy, as well as an allergy to the cement in his knee replacement, in June 2012 (Exhibit 13F/10; 14F). Dr. Bilfield revised the knee replacement on July 24, 2012 (Exhibit 17F/7-8, 13-14; 29F/234-235). The claimant refused occupational and physical therapy, and noted that this surgery was easier than the prior one. He explicitly stated that he would not perform his movements as instructed, but would instead move as he saw fit (Exhibit 17F/27, 30, 37). The claimant told Dr. Bilfield on August 22, 2012, that he was doing well. He had 80 degrees of motion in his knee (Exhibit 18F/l). By September 27, he had 95 degrees of motion (Exhibit 18F/12). An ER note from November 17, 2012, showed full range of motion (Exhibit 19F/7-8). The claimant did attend physical therapy in late 2012, and his physical therapist noted that he ambulated with one crutch, and could ambulate without any crutches but with increased pain (Exhibit 22F/33). He completed 22 PT sessions with more improvement (Exhibit 22F/1).

An x-ray on January 9, 2013, showed a stable cemented right total knee arthroplasty with diminishing effusion (Exhibit 19F/l). The claimant saw Robert Molloy, M.D., for pain management on May 28, 2013, and described his knee pain as 5/10 (Exhibit 21F/l; 29F/199). On exam, he had normal gait and alignment in both legs. His right knee continued to have reduced range of motion, at only 95 degrees compared to 135 in the left. Dr. Molloy noted some quad atrophy, and encouraged more therapy, as he saw no other cause for the claimant's pain. Claimant's x-rays did not show any evidence of loosening (Exhibit 21F/3; 29F/201).

Claimant continued to experience pain and popping. Dr. Bilfield performed a right knee arthroscopy with excision of a peripatellar scar on August 1, 2013 (Exhibit 24F/7-8; 29F/173). By September 3, 2013, claimant was able to go short distances

4

without his crutches (Exhibit 29F/163). By September 19, 2013, claimant was able to ambulate without crutches with antalgic gait (Exhibit 29F/155). Dr. Bilfield performed an open scar excision and patellar revision of the right knee on December 10, 2013 (Exhibit 29F/81-82). Claimant's knee was stable on February 27, 2014, and ambulation was good without cane or crutches (Exhibit 28F/31; duplicate at 50F/64). An MRI on July 9, 2014 showed a total knee arthroplasty without complication. There were post-surgical changes of the distal quadriceps tendon (Exhibit 29F/309, 365). By July 17, 2014, claimant ambulated well with nonantalgic gait and no ambulatory aids (Exhibit 28F/74; duplicates at 29F/25; 50F/82).

Notes from Hazem Nouraldin, M.D., in 2015 showed reflexes, gait and coordination were intact (Exhibit 33F/7, 12, 20, 29, 37). Records also note normal gait in April and June 2016 (Exhibit 33F/41; 36F/59) and normal gait in 2017 (Exhibit 40F/21; 44F/20).

On January 11, 2018, claimant showed full range of motion of the right knee with some tenderness with external rotation. Claimant showed normal strength and no joint laxity. There were no gross motor or sensory deficits. Claimant had a normal gait (Exhibit 39F/11).

Claimant present to the emergency department at the Cleveland Clinic on July 18, 2019, for a dressing change for a gunshot wound. Claimant says he was shot 2 weeks ago and had an exploratory laparoscopy at the time. He was sent home and then readmitted due to an intraabdominal infection. He said he had been discharged from University Hospitals the previous day with no supplies and no pain pills. Claimant is supposed to have daily dressing changes but he said the home health nurse did not come show up (Exhibit 46F/5). Claimant had a midline incision with three areas of packing. There were exit and entrance wound in the right flank. Cleveland Clinic personnel tried to contact University Hospitals regarding claimant's hospital course, but were unsuccessful. Claimant's wounds were repacked and he was provided Percocet. He said he had follow up the next day at University Hospitals (Exhibit 46F/8).

Claimant broke his right hand during an altercation in August 2019. Notes from the Plastic Surgery Department at the Cleveland Clinic dated November 11, 2019, indicate claimant took his cast off prior to therapeutic time frame. A cast was applied to claimant's right arm (Exhibit 49F/14-17).

Claimant started physical therapy on December 31, 2019, for right hand stiffness, decreased active range of motion and increased pain from MCP fracture over 4 months ago. Claimant also said he had a gunshot wound to the abdomen last August when he hit someone, causing the fifth metacarpal fracture (Exhibit 49F/6; 51F/5). Claimant was given a custom orthosis (Exhibit 49F/7; 51F/6). Therapy was discontinued on March 31, 2020, due to noncompliance with therapy plan of care. Claimant's last therapy visit had been January 9, 2020 (Exhibit 51F/7).

Claimant presented to the emergency room at the Cleveland Clinic on July 19, 2020, with a laceration of the right hand after punching a window (Exhibit 51F/13). Claimant weighed 220 pounds (Exhibit 51F/15). Claimant was able to wiggle his fingers. There was no tendon or bone exposure. Claimant had a V shaped laceration on his right hand (Exhibit 51F/16). Claimant's wound was cleaned and sutured (Exhibit 51F/18-19).

EMS brought claimant to the emergency room at the Cleveland Clinic on September 8, 2020 (Exhibit 51F/54-56). Claimant fell off his bike and previous night and complained of foot pain. He also hit his left elbow and knee (Exhibit 51F/57). Claimant showed normal range of motion in the left foot. There was no deformity of the left foot. There was tenderness at the lateral and medial malleolus. There was tenderness at the base of the fifth metatarsal. (Exhibit 51F/60). Claimant was diagnosed with left ankle sprain. He was treated with Tylenol, ibuprofen, ice, crutches and a boot with good relief of symptoms. The claimant was stable throughout his stay in the ED and was discharged (Exhibit 51F/62-63). X-rays did not show fracture (Exhibit 51F/65- 67).

Claimant presented to the Plastic Surgery Department at the Cleveland Clinic on September 22, 2020, for follow up for his right fifth metacarpal fracture. Claimant said the fifth metacarpal was still very painful and the pain keeps him up at night. Physical therapy for two months was recommended (Exhibit 51F/76-81)

. . .

The claimant saw Mitchell Wax, Ph.D., for a consultative examination on February 3, 2012. Claimant was treated for schizo-affective disorder while incarcerated. He said he did not want to see psychiatrists because he did not like them. He was not in counseling. The claimant reported over 40 arrests for trafficking in crack cocaine, possession of crack cocaine, stealing cars, and three times for felonious assault. He was last arrested in October 2010 for possession of crack cocaine. He has been in prison nine times, last released in October 2010 after spending a year for trafficking in cocaine. Claimant reported getting into physical fights or arguments three to four times a week, mostly with strangers. The claimant reported being a past drug and alcohol abuser. He last used crack cocaine one year ago and last used heroin several years ago. He last drank regularly five years ago, but did have one 12-ounce beer two days ago. He said he drank a beer once a week. Claimant was inattentive and unwilling to provide information. He appeared to intentionally not answer questions directly. Initially he said he did not know why he was at the evaluation, but when probed it became apparent he did know (malingering is noted). Claimant complained of memory problems, but could not provide specific examples. Dr. Wax was surprised that the claimant could not recall any items after five minutes. He diagnosed the claimant with bipolar disorder and intermittent explosive disorder (Exhibit 9F/5-7).

Dr. Wax evaluated the claimant again at the request of the State agency on March 17, 2015. Claimant said he was in special education classes in elementary school. Claimant brought his medications to the evaluation, but none were psychotropic medications. Claimant said he was in a psychiatric facility while incarcerated. He had not followed up with mental care since his last incarceration. He was not in counseling. The claimant reported having been arrested over 20 times for violent crimes including felonious assault twice, kidnapping, aggravated robbery, trafficking in cocaine twice, possession of cocaine six times, and auto theft. Claimant said he last smoked marijuana three days prior to this evaluation, and he smoked marijuana twice a week. He said he drank alcohol twice a week. Claimant was again inattentive and often needed questions repeated. Claimant would not provide clear information about he spend a typical day, other than watching TV. Claimant said he had anger issues. Dr. Wax diagnosed schizoaffective disorder, bipolar type; personality disorder with antisocial features; intermittent explosive disorder; and alcohol abuse (Exhibit 32F).

Claimant was arrested for a probation violation in 2017. He was booked into the county jail on August 24, 2017, for failure to report dirty urine (cocaine, THC). It was noted he had never seen a psychiatrist in the community (Exhibit 38F/2). Claimant was referred for treatment by the court system. He was assessed at Oriana House on January 11, 2018 (Exhibit 39F/5). He reported last using cocaine at the end of October 2017. He last used alcohol on November 7, 2017. He typically drank 12 pack of beer twice a week. He last used cannabis on October 31, 2017. He used cannabis about 4-6 times a month (Exhibit 39F/7). Claimant was restarted on Trazodone. Celexa and Zyprexa were continued (Exhibit 39F/14).

The record shows the claimant has been in and out of the Cuyahoga County Jail since 2017. Claimant was booked into the Cuyahoga County Jail on August 24, 2017, for a probation violation for failure to report dirty urine (cocaine, THC) (Exhibit 38F/2).

Kevin Blake, LPCC, of the Centers for Families and Children evaluated the claimant on September 28, 2017 at Lutheran Hospital. Claimant said he had been suicidal, but he stopped thinking about suicide after thinking about his family. He denied current suicidal or homicidal ideation. Claimant said he had flashbacks of being molested. He alleged numerous other symptoms, including paranoia, and audio, visual and tactile hallucinations (Exhibit 45F/3). Claimant reported he was using marijuana daily and drinking alcohol prior to probation (Exhibit 45F/5). Mr. Blake diagnosed paranoid schizophrenia, major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder and polysubstance abuse. Claimant was to be linked with a CPST and psychiatric services (Exhibit 45F/7-9).

Claimant was again booked into the Cuyahoga County Jail on November 19, 2017, this time for domestic violence. He claimed he had been diagnosed with schizophrenia but he was not prescribed any meds for such neither does he manifest any symptoms. There were no objective findings. Claimant said he hears things,

but he showed organized thinking (Exhibit 44F/22). It was unclear how long claimant was in jail, but by March 2018, he was in a halfway house (Exhibit 45F/26).

Claimant sought mental health treatment on October 12, 2018. Claimant said he was taking medications, but he did not follow through with mental health services. Claimant said he hears voices all the time, but he did not appear internally stimulated. He was upset he was back in jail (Exhibit 43F/2). Malingering was suspected. Medications were not indicated (Exhibit 43F/2).

Claimant presented to Circle Health Services East on June 5, 2019, for an initial psych evaluation. He wanted to get back on meds and said he had "Been depressed a lot". Claimant was recently in prison for 6 months. He was released on March 25. He had not used any medication since his release. Claimant was depressed and anxious, although he denied panic symptoms. He reported physical, emotional and sexual abuse in childhood. He said he had been shot several times. He had a history of gang involvement. He was both the victim and perpetrator of violence. He said he heard voices. He drank beer 2-4 times a month and used marijuana every other day (Exhibit 47F/4-5). Claimant gave coherent responses. He was oriented. He showed limited insight and moderate impairment in judgment (Exhibit 47F/7). Claimant was diagnosed with PTSD, psychosis NOS (primary psychotic disorder vs substance induced psychosis vs trauma related psychotic symptoms), depressive disorder (SIMD vs MDD vs MDD w/ psychosis), cannabis use disorder, and nicotine use disorder. Further assessment was needed to rule out current etoh abuse. Claimant was started on Prozac for depression and trauma symptoms, Abilify for psychotic symptoms and trazodone for sleep (Exhibit 47F/7-8; duplicate at 48F/12).

Claimant was brought to the emergency department at the Cleveland Clinic by CPD on December 12, 2019. His parents called 911 after claimant was beating on their door. Claimant was unable to provide much history and was unsure why he was at the hospital. He was intoxicated on PCP. Claimant was allowed to sober up in the ED. The cast on his right hand was intact (Exhibit 49F/11-13).

Records from January 2020 indicate claimant was at the Centers residential substance abuse treatment facility (Exhibit 48F).

Claimant was brought to the emergency department at the Cleveland Clinic by CPD on August 25, 2020. Claimant had been found on the street alone and yelling obscenities. He told triage nurse he had used PCP earlier in the day (Exhibit 51F/37). Claimant's neurological status was intact. No external trauma was identified. Claimant was able to ambulate independently. He was observed for over an hour. He was able to hold a logical conversation and asked to be discharged. He was able to arrange for a ride. He was discharged home with verbal and written instructions (Exhibit 51F/40).

(ECF No. 9, PageID #: 896-901).

IV.     **The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

1. The claimant has not engaged in substantial gainful activity since October 27, 2011, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: reconstructive surgery of weight bearing joint; essential hypertension; affective disorders; personality disorders; and substance addiction disorders (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), specifically claimant and [sic] lift and carry, push/push 10 pounds frequently and up to 20 pounds maximum occasionally. He can stand/walk 4 hours in an 8-hour day and sit for 6 hours in an 8-hour day. Claimant can frequently operate right foot controls. He can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. The claimant can frequently stoop, occasionally kneel, occasionally crouch, but never crawl. Claimant can never be exposed to hazards such as unprotected heights or dangerous machinery. Claimant is limited to simple, routine tasks, but not at a production rate pace. He can occasionally interact with supervisors and co-workers, but never interact with the public. The claimant is limited to routine workplace changes.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

. . .

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 27, 2011, the date the application was filed (20 CFR 416.920(g)).

(ECF No. 9, PageID #: 892-94, 904-05).

9

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light

of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C. Discussion

Claimant raises two issues on appeal, arguing that (1) the ALJ erred in her treatment of certain opinions and (2) the ALJ erred in determining Claimant's RFC without properly considering his impairments.

### 1.  The ALJ did not err in weighing the medical opinions.

Claimant first argues that the "ALJ erred in her evaluation of, and weight assigned to, the opinions of Dr. Bilfield and Dr. Nouraldin (treating physicians) and to the opinions of examining psychologist Dr. Wax." (ECF No. 12-1 at 21).

Under the treating source rule,[2] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). "It is an

---

[2] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. However, Dorsey filed his claim before the revision took effect such that the treating source rule applies.

error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, at *2.

> If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.

*Blakley*, 581 F.3d at 406; *see also* § 416.927(c)(2). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR 96-2p, 1996 WL 374188, at *5). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

### a.  Dr. Bilfield

Claimant argues that "the ALJ erred by not being specific or detailed in rejecting Dr. Bilfield's opinion nor did she apply any of the factors set forth in 20 CFR § 404.1527(d)(2)." (ECF No. 12-1 at 23). Claimant argues that the ALJ's rational that his 'abilities should improve as he

recovers from surgery'" "ignores the near two-year period preceding Dr. Bilfield's August 2013 opinion when Mr. Dorsey was unable to stand and walk for any appreciable amount of time after having undergone" multiple procedures since December 2011. (*Id.*). Claimant further argues that the ALJ "succumbed to the temptation to play doctor." (*Id.*).

The Commissioner responds that the ALJ did not ignore evidence from the two-year period because "she discussed it at length earlier in her hearing decision." (ECF No. 13 at 8). The Commissioner argues that "[a]s the ALJ acknowledged, Plaintiff had four procedures during this period, in December 2011, July 2012, August 2013, and December 2013" and the "[e]vidence cited by the ALJ show[ed] Plaintiff had limitations during the recovery period for each surgery, but not at the level in Dr. Bilfield's opinions." (*Id.*). The Commissioner argues that the "ALJ was also right that Plaintiff improved far more than Dr. Bilfield predicted at the time of his final opinion," as evidenced by records showing Claimant "walked normally without limping or using an assistive device" seven months after his last surgery and his statement that "he was going to the gym and performing squats with 135 pounds 'without a problem.'" (*Id.*).

The ALJ discussed two opinions authored by Dr. Bilfield in her decision:

Lawrence Bilfield, M.D., completed a medical source statement regarding claimant's physical capacity on August 8, 2012. He indicated sitting, standing or walking were affected by knee revision, but did not cite specific limits. Claimant could rarely perform postural activities. Dr. Bilfield cited limits on reaching, handling, fingering and feeling. Claimant could not work at heights, around moving machinery or temperature extremes (Exhibit 16F).

Dr. Bilfield completed another medical source statement on August 20, 2013. He opined claimant can lift up to 10 pounds occasionally and 0 pounds frequently. Claimant can stand/walk 10 minutes without interruption, for a total of one hour in an 8-hour day. Claimant can sit for 15 minutes without interruption, for a total of 3-4 hours in an 8-hour day. Claimant can rarely climb, balance, stoop, kneel, crouch or crawl. Claimant can occasionally reach, rarely push/pull, and occasionally perform fine and gross manipulation. Claimant is restricted from working at heights, around moving machinery or temperature extremes. Claimant has been prescribed a cane, walker, brace and wheelchair. Claimant needs to alternate

13

positions between sitting, standing or walking at will. Pain will interfere with concentration and take the claimant off task. Claimant needs to elevate his legs 90 degrees at will and would need to take unscheduled breaks (Exhibit 26F). The undersigned gives both these opinions little weight. No reasons are cited to support the limits on sitting, reaching and performing fine and gross manipulation. Dr. Bilfield performed the claimant's knee surgeries. The record does not show back and/or hand/arm impairments to support these limits. In addition, the second statement was completed only a few weeks after claimant's August 1, 2013, arthroscopy. Claimant's abilities should improve as he recovers from the surgery.

(ECF No. 9, PageID #: 902).

Based on this discussion, the Court finds Claimant's arguments meritless. The ALJ provided specific and detailed reasons for assigning Bilfield's opinions little weight, specifically noting the lack of "reasons cited to support the limits on sitting, reaching and performing fine and gross manipulation;" that Bilfield performed Claimant's knee surgeries such that the record did not show back and/or hand/arm impairments to support the limitations; and the short amount of time between Claimant's August 1, 2013 arthroscopy and Bilfield's August 20, 2013 opinion. (*Id.*). Additionally, these reasons show that the ALJ considered the relevant factors, including supportability and consistency. *See* 20 C.F.R. § 416.927(c).

Contrary to Claimant's argument, rather than ignoring his multiple knee procedures over the two years before Bilfield's opinion, the ALJ discussed Claimant's prior procedures in detailing the medical history. (*Id.* at PageID #: 896-97). The ALJ noted that throughout 2012, Claimant's range of motion in his knee varied from 80 degrees to full range of motion and Claimant could ambulate with one crutch or no crutches but increased pain. (*Id.*; *see id.* at PageID #: 740, 751, 762, 832). The ALJ further noted that "[b]y September 19, 2013, claimant was able to ambulate without crutches with antalgic gait" and "[b]y July 17, 2014, claimant ambulated well with nonantalgic gait and no ambulatory aids." (*Id.* at PageID #: 897; *see id.* at PageID #: 1715, 1845). Thus, substantial evidence supports the ALJ's decision that Bilfield's opinions were unsupported by and

14

inconsistent with the record and therefore afforded little weight.

### b. Dr. Nouraldin

Claimant argues that the ALJ "dismissed Dr. Nouraldin's opinion finding that it was inconsistent with the doctor's own records and cited treatment notes in 2012 soon after his first revision surgery" but "omitted from her discussion Dr. Nouraldin's treatment notes throughout 2015 noting [Claimant's] severe right knee pain associated with locking, popping, joint stiffness, swelling and decreased range of motion." (ECF No. 12-1 at 25). The Commissioner responds that Dr. Nouraldin's opinion was "insufficiently supported by the doctor's own treatment notes" because the same notes Claimant cites "as showing he complained of pain, popping, and swelling in the knee . . . also show that Plaintiff nevertheless had normal strength and gait." (ECF No. 13 at 9).

The ALJ summarized Nouraldin's opinion and her treatment of it:

Hazem Nouraldin, M.D., completed a physical capacity form on July 3, 2012. He opined the claimant can lift and carry up to 15 pounds maximum. Claimant can stand/walk 30 minutes at a time for a total of one hour in an 8-hour day. There were no limits on sitting. Claimant could rarely perform postural activities. Limits were cited on reaching, handling, fingering and feeling due to claimant's use of a cane. Claimant could not work at heights or around moving machinery due to knee pain and imbalance. Dr. Nouraldin cited right knee weakness and pain as the reason for the limits (Exhibit 15F). The undersigned gives this opinion little weight because it is inconsistent with records from Dr. Nouraldin. Dr. Nouraldin was the attending physician when claimant was hospitalized from December 31, 2011, through January 2, 2012, for dizziness, fatigue, nausea and vomiting. Claimant had undergone knee replacement the previous week. He had been taking OxyContin with significant constipation and abdominal pain. The primary diagnoses was dehydration with mild acute renal failure related to poor p.o. intake from constipation (Exhibit 8F/6-7). This hospitalization does not show sufficient reason for the limits assessed. Dr. Nouraldin's name is also noted during a hospitalization from July 24, 2012, through July 27, 2012, when claimant was hospitalized for a revision of his knee replacement (Exhibit 17F/7-12). Records after this surgery showed improvement in claimant's knee functioning. On August 22, 2012, claimant said that he was doing well. He had 80 degrees of motion in his knee (Exhibit 18F/l). By September 27, he had 95 degrees of motion (Exhibit 18F/12). An ER note from November 17, 2012, showed full range of motion (Exhibit 19F/7-

8).

(ECF No. 9, PageID #: 902).

The ALJ assigned Nouraldin's opinion little weight because it was unsupported and inconsistent with his own medical records from the time around when he gave the opinion. (*Id.*). Substantial evidence supports the ALJ's conclusion. The ALJ specifically noted that Nouraldin was noted on records from two of Claimant's hospitalizations—both of which were approximately a week following a knee surgery—but these records did not contain support for the extensive limitations. (*See id.* at PageID #: 566-67, 698-708).

The ALJ also provided good reasons for giving the opinion little weight. In addition to being unsupported, the ALJ observed that records from after Claimant's hospitalizations "showed improvement in claimant's knee functioning." (*Id.* at PageID #: 902). To support this conclusion, the ALJ cited to records indicating Claimant was recovering well from surgery and had full range of motion approximately four months after the opinion was issued. (*See id.* at PageID #: 710, 751, 762).

Claimant does not point to anything in the records cited by the ALJ—the only records indicating Nouradlin's treatment of Claimant prior to authoring the opinion—to support that the ALJ erred in assigning little weight to Nouraldin's opinion. Rather, Claimant points to Nouraldin's treatment records approximately three years *after* the opinion was authored. Nevertheless, although not cited specifically in the discussion of the opinion, the ALJ did consider this evidence earlier in the decision, indicating that "[n]otes from Hazem Nouraldin, M.D., in 2015 showed reflexes, gait and coordination were intact (Exhibit 33F/7, 12, 20, 29, 37). Records also note normal gait in April and June 2016 (Exhibit 33F/41; 36F/59) and normal gait in 2017 (Exhibit 40F/21; 44F/20)." (*Id.* at PageID #: 897). Thus, this evidence, which includes generally normal

16

findings, also supports the ALJ's conclusion to assign little weight to Nouradlin's opinion.

Ultimately, substantial evidence supports the ALJ's decision to withhold controlling weight from Nouraldin and the ALJ provided good reasons for assigning the opinion little weight such that the ALJ did not err.

### c.  Dr. Wax

Claimant asserts that the ALJ "gave little weight to Dr. Wax's opinions because they were based on Mr. Dorsey's report and the doctor recognized Mr. Dorsey was being vague and possibly not answering questions correctly," but "[a]s the Appeals Council noted in its Order in June 2020, Dr. Wax considered Mr. Dorsey's behavior during the evaluation in assessing his limitations in the workplace on two separate occasions." (ECF No. 12-1 at 27). Claimant argues that the ALJ "has not provided sufficient rational to wholly ignore the findings and opinions of the examining psychologist," such that her treatment of the opinion "lacks the support of substantial evidence and violates SSA regulations." (*Id.*).

The Commissioner responds that "[s]ince Dr. Wax was not a treating physician, the ALJ was not required to give the opinion the level of deference sometimes afforded to treating opinions." (ECF No. 13 at 9 (citing *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012)). The Commissioner argues that the ALJ "was entitled to find that possible malingering undermined Dr. Wax's opinion, especially since the psychologist did not seem to consider the possibility of intentionally misleading behavior when he issued his opinion regarding Plaintiff's limitations." (*Id.* at 10).

The ALJ addressed Wax's opinion in her decision:

Consultative psychological examiner Wax opined the claimant would have difficulty carrying out instructions; performing simple and multistep tasks; responding appropriately to supervisors and coworkers; and responding to pressures in a work setting (Exhibit 9F/6-7). After a consultative psychological

examination in 2015, Dr. Wax assessed the same limitations in 2015, except he opined claimant would not respond appropriately to work pressures in a work setting (Exhibit 32F/6-7). The undersigned gives these opinions little weight because they are heavily based on claimant's report even though the doctor recognized the claimant was being vague and possibly even answering questions incorrectly.

(ECF No. 9, PageID #: 902).

The Court finds no error in the ALJ's treatment of Wax's opinions. In reviewing the records, the ALJ noted that Wax conducted consultive examinations twice, once in 2012 and again in 2015 at the request of the State agency. (*Id.* at PageID #: 899). The ALJ's discussion of Wax's opinions makes clear that she assigned Wax's opinions little weight because they were based on Claimant's own reports—which Wax recognized were impaired by Claimant being vague and possibly answering questions incorrectly—rather than an ongoing treatment relationship with Claimant. Because "[t]his constitutes a proper reason for denying controlling-weight status" if Wax were a treating source, it is also sufficient to explain why the ALJ assigned little weight to the opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 257-58 (6th Cir. 2016).

**2. The ALJ did not err in determining the RFC.**

Claimant argues that the ALJ erred in finding him capable of performing a range of light work because the RFC did not properly account for limitations in his ability to stand and walk or use his upper extremities. (ECF No. 12-1 at 27).

Specifically as to his ability to stand or walk, Claimant argues that the ALJ's determination that he "retained the residual functional capacity to stand/walk for four hours in an eight-hour day is not supported by substantial evidence in the record," nor are the two non-examining reviewing physicians' opinions the ALJ relied on. (ECF No. 12-1 at 28). Claimant points to his multiple knee surgeries and reports of his corresponding pain to support that he did not have the ability to stand or walk as set forth in the RFC. (*Id.* at 29-30). The Commissioner responds that the ALJ discussed

his knee replacement and subsequent revision surgeries "at length in her decision" and Claimant's argument does not address the evidence "that suggest he had only brief interruptions in his mobility with the procedures, and that he recovered completely after the final surgery in December 2013." (ECF No. 13 at 14).

In setting forth the medical history, the ALJ cited Claimant's reports that he was "doing well" after his July 2012 surgery and had full range of motion by November 2012. (ECF No. 9, PageID #: 896). The ALJ also noted Claimant's surgeries in August and December 2013, specifically referencing that by September 2013 Claimant was able to ambulate without crutches and "ambulation was good" by February 2014. (*Id.* at PageID #897). The ALJ cited additional instances after his knee surgeries where Claimant had normal gait but despite this evidence still included standing and walking limitations based on Claimant's knee surgeries. (*Id.* at PageID #: 897-98). Based on the evidence cited, the Court concludes that substantial evidence supports the ALJ's finding concerning Claimant's ability to stand and walk for four hours in an eight-hour day.

Concerning his fingers, hands, and left elbow conditions, Claimant argues that the ALJ did not consider much of the evidence concerning his hands "nor was there *any* evaluation of Mr. Dorsey's left elbow condition," making it "difficult to decipher whether the ALJ ignored the evidence or overlooked it." (ECF No. 12-1 at 31). The Commissioner responds that the ALJ "directly addressed Plaintiff's left elbow at step two, noting that Plaintiff injured the elbow in October 2015, that he had surgery on the elbow the following June, and that he had to have an additional procedure to drain a hematoma the next month." (ECF No. 13 at 13). But the Commissioner argues "there is no evidence that the impairment persisted after mid-2016, and the ALJ was thus correct to find that it did not constitute a severe impairment at step two of the sequential evaluation process." (*Id.*). Additionally, the Commissioner argues that Claimant "has

not pointed to relevant evidence of ongoing limitations overlooked by the ALJ." (*Id.*). As to Claimant's hand injury, the Commissioner argues that the ALJ discussed the injury and "pointed out that Plaintiff repeatedly failed to follow recommended treatment—he removed orthotics against medical advice and failed to follow-up with treatment," and record includes evidence that he had normal strength and motion in the hand" such that the ALJ's determination is supported by substantial evidence. (*Id.*).

Contrary to Claimant's arguments and as indicated by the Commissioner, the ALJ specifically discussed Claimant's left elbow. At step two, the ALJ explained:

> Claimant first complained of left elbow pain in October 2015, after a fall (Exhibit 33F/19). He received injections in the left elbow (Exhibit 33F/25, 33). Kim Sterns, M.D., excised a large bursa and osteophyte from the left elbow on June 30, 2016 (Exhibit 36F/61-62). The claimant developed a hematoma, and Dr. Sterns performed an incision and drainage of the hematoma on July 22, 2016 (Exhibit 36F/63-64). This impairment improved after surgery and did not cause more than minimal limitations.

(ECF No. 9, PageID #: 893). Thus, the ALJ considered Claimant's left elbow impairment and found that limitations were not warranted.

The ALJ also discussed the various records Claimant cites regarding his hands. The ALJ considered Dr. Edward Butler's opinion that Claimant would have "mild limitations to the use of his hands" but gave this opinion little weight because "it is vague and the limits are not specified" and "[a]t this time, claimant had not alleged any hand related impairments." (*Id.* at PageID #: 896). Claimant argues that "Dr. Butler's examination findings actually revealed bony enlargement of Mr. Dorsey's right middle finger, flexion contracture of the PIP joints of the left middle and ring finger and right middle finger, and no active flexion in the PIP and DIP joints of his left middle finger." (ECF No. 12-1 at 30). This argument seems to address whether the opinion was consistent with the record, but the ALJ assigned the opinion little weight based on it being vague, not

inconsistent or unsupported. The ALJ also discussed additional medical records that showed Claimant had ongoing pain in his right fifth metacarpal following a fracture. (ECF No. 9 at PageID #: 897-98). Thus, it is clear to the Court that the ALJ considered Claimant's hand and finger impairments but found that additional limitations in the RFC were not warranted.

Overall, substantial evidence supports the ALJ's RFC. While Claimant highlights evidence that may support an alternative conclusion, as long as substantial evidence supports the ALJ's decision, the Court must defer to it "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 6114 (6th Cir. 2003).

## VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Plaintiff benefits. Plaintiff's Complaint is DISMISSED.

Dated: March 7, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE
